**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
AYINDE FAIR,

                              Petitioner,

          -against-                              **REPORT &**
                                                       **RECOMMENDATION**
**SUPERINTENDENT, Shawangunk Correctional**      **CV-05-2480 (NGG)(SMG)**
**Facility,**

                              Respondent.
-----------------------------------------------------------X
GOLD, S., U.S.M.J.:

## Introduction

       Ayinde Fair brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254,

as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). United

States District Judge Nicholas G. Garaufis has referred Fair's petition to me for a report and

recommendation. For reasons set forth below, I respectfully recommend that the petition for

habeas relief be denied.

## Background

       On July 7, 1998, at approximately 10:45 in the evening, guns were fired in front of the

building located at 163-11 Foch Boulevard in Queens. One man, Curtis Scott, was killed, and

another, Jamel Ethridge (a/k/a "Tyreek") was wounded. The petitioner, Ayinde Fair, was later

arrested and charged with two counts of murder in the second degree based on the fatal shooting

of Curtis Scott, one count of attempted murder based on the shooting of Jamel Ethridge, two

counts of criminal possession of a weapon in the second degree, and two counts of criminal

possession of a weapon in the third degree. Castellano Aff. in Opp. to Pet. ("Castellano Aff.")

¶ 4. Fair was convicted after trial of attempted murder in the second degree based on the

shooting of Jamel Ethridge and two counts of criminal possession of a weapon in the second degree, and was found not guilty of the two murder charges arising from the shooting death of Curtis Scott. Fair was sentenced to concurrent terms of twenty years for attempted murder and fifteen years for each weapons possession charge. Castellano Aff. ¶¶ 5-6.

*The Evidence at Trial*

A taxi driver, Lloyd Francis ("Francis"), testified at trial that he picked up four men outside 117-02 Foch Boulevard at approximately 10:00 in the evening on July 7, 1998. Tr. at 681. One of the four, Jamel Green, a/k/a "Fox", approached Francis and asked him to take the men to 115th Street and Sutphin Boulevard. *Id.* Fox got into the front of the cab; shortly thereafter, the other three men exited a store and got into the back seat. Tr. at 681-82. Francis identified one of the men in the back seat as the petitioner, Ayinde Fair. Tr. at 682. As Francis was proceeding down Foch Boulevard, the men asked him to stop at building number 169, where one of the men got out of the cab. *Id.* Fox, the petitioner, and a third man remained in the taxi. Tr. at 683.

Francis testified that he continued to drive until he reached the intersection of Guy Brewer and Foch Boulevards, where Fox told him to pull over. *Id.* Fox then exited the taxi and walked over to "a couple of guys" standing in front of 163-11 Foch Boulevard. *Id.* Although he could not hear what the men were saying, Francis could see Fox gesticulating, raising his hands above his shoulders and moving them from side to side. Tr. at 684. Fox then returned to the car, and Francis heard him say to the petitioner and the third man: "That guy dissed me. That guy dissed me. Pop that nigger." *Id.* Francis then observed petitioner Fair and the third man exit the taxi, armed with guns. Tr. at 685. Francis did not see Fox with a gun. *Id.* Approximately

twenty seconds later, Francis heard gun shots and ducked down in his taxi for cover. Tr. at 686. He did not see who fired the shots, nor was he able to say how many shots were fired. *Id.*

Francis testified that the three men ran back to the taxi, and that petitioner and the third man were still holding their weapons. Tr. at 687, 692. Fox again sat up front and the petitioner and Jones sat in the back, with petitioner on the driver's side. *Id.* After Francis drove off, he stopped at the light at Guy Brewer and Foch Boulevards. Tr. at 690. When he stopped, the petitioner put a gun to his head and said "Drive, drive, drive, before I pop you." Tr. at 690. Francis then went through the red light and turned left, onto 163rd Avenue. Tr. at 692. At this point, all three men exited the car, and Francis went home. *Id.*

At trial, Francis admitted that he first told the police that his girlfriend was using his cab on the night in question, and that he was at home sleeping when the shootings occurred and had no knowledge of them. Tr. at 716-17. After the police spoke to his girlfriend, however, Francis was interviewed again, and related the events as he described at trial. Tr. at 718-19. Francis also testified that he knew Fox and Fair from driving them on previous occasions, and that he identified each in a separate lineup prior to trial. Tr. at 694-95.

Bashair Hogan testified that, on the night of the shooting, he was standing at the bottom of the hill near 163-11 Foch with Jamel Ethridge when he was approached by three men he identified as Fox, Ayinde and Leon. Tr. at 448-50, 593. At this point, Curtis Scott was walking down the hill. Tr. at 596-97. At some point, Fox slapped Hogan, and then told Leon and Ayinde to "kill everybody," after which Hogan heard gun shots. Tr. at 594. Hogan then ran from the scene and, although he did not see anything further, he did hear screaming. Tr. at 595. When he reached home, Hogan called 911, then went back outside, and saw Curtis Scott lying on the

ground.  Tr. at 599-600.[1]

Jamel Scott (a/k/a "Mel"), Curtis Scott's brother, also testified at trial.  Tr. at 767.  Jamel

Scott testified that he was inside 163-11 Foch when he heard three shots.  Tr. at 768.  He then

came out of the building and saw his brother Curtis lying on the ground and the petitioner

standing approximately one foot away with a gun in his hand.  Tr. at 769-70.  At that point, Jamel

Scott heard Fox say, "get Mel," at which point petitioner fired two or three shots at him.  Tr. at

770.  Scott further testified that he saw Leon Jones shoot at Jamel Ethridge.  Tr. at 772-73.

Finally, Scott stated that he returned to tend to his brother once Fox, Jones and the petitioner had

gone.  Tr. at 773.

The prosecution also presented medical and ballistic evidence at trial.  Officer John

Michaud testified that he was one of the first officers on the scene and discovered empty shell

casings or cartridges approximately twenty feet away from Curtis Scott.  Tr. at 414.  Paramedic

Guy Caprico testified that, when he turned Curtis Scott over to examine him, there was a silver

gun positioned between Curtis Scott's right arm and his chest that Caprico described as "on

[Scott's] person."  Tr. at 434, 440.  The weapon was later identified as a .9mm Taurus.  Tr. at

667, 906.  Detective Dennis Bush of the Crime Scene unit testified that he recovered nine

discharged shells from the scene: six .380mm shells and three .9mm shells.  Tr. at 541, 549-53.

He also recovered one full, unspent .9mm cartridge from the scene.  Tr. at 549, 562.  A .9mm

bullet was recovered from Curtis Scott's head.  Tr. at 734-35.  A second bullet, described by the

---

[1]When first questioned on direct examination, Hogan testified that he saw nothing and did not know anything about the shootings.  Tr. at 447-54.  At the prosecution's request, the court recessed, and Hogan was recalled later in the trial.  Tr. at 592 *et seq*.  Hogan then gave the testimony described in the text.

doctor who removed it as a .9mm bullet but later identified by a ballistics expert as a .380mm bullet, was recovered from Jamel Ethridge's chest. Tr. at 763, 912.

Detective Sergio Gennari, the prosecution's ballistics witness, testified that all of the .380mm casings came from the same gun, and that all of the .9mm shells came from a single second gun. Tr. at 906-07, 909, 913. He further testified that he determined that the .380 bullet recovered from Ethridge's chest came from the same gun as another "spent round" found on the scene. Tr. at 912-13, 755. Finally, Gennari determined after testing that none of the .9mm shells found at the scene were fired from the gun found under Curtis Scott's body. Tr. at 913.

Paramedic Caprico observed that Curtis Scott's only wound was the one to his head. Tr. at 435. Medical examiner Joseph Veress later testified that the cause of Curtis Scott's death was a gunshot wound to the head. Tr. at 732. Veress testified that the bullet that killed Scott most likely came from a gun held at a fifteen degree angle, level with the victim's head, and located about 18-24 inches away from the victim. Tr. at 738-40. Dr. Michael Bertocchi was a member of the trauma team that treated Curtis Scott on the night he was shot. Tr. at 745. Dr. Bertocchi concurred that the cause of Scott's death was a brain injury secondary to a gunshot wound to the head. Tr. at 747. Dr. Bertocchi also testified that he treated Jamel Ethridge for a gunshot wound to the chest and was able to remove the bullet. Tr. at 748, 754, 763.

At the close of evidence, the court charged the jury on intentional murder in the second degree, depraved indifference murder in the second degree, attempted murder in the second degree, and two counts of criminal possession of a weapon in the second degree. The court's charge included a discussion of the concept of acting in concert, which provided in pertinent part as follows:

Our law recognizes that two or more individuals can act jointly to commit a crime and that in certain circumstances each can be held criminally liable for the acts of the others.

In that situation those persons can be said to be acting in concert with each other. Our law defines the circumstances under which one person may be criminally liable for the conduct of another. That definition is as follows:

When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the state of mind required for the commission of that offense, he or she solicits, requests, commands, importunes or intentionally aids such person to engage in such conduct.

Now, under that definition mere presence at the scene of a crime, even with knowledge that the crime is taking place or mere association with a perpetrator . . . of a crime does not by itself make a defendant criminally liable for that crime.

Tr. at 1069-70.

After the jury began deliberating, they sent a note to the judge stating, "We need clarification on what exactly acting in concert means by law, and does this concept apply to all counts." Tr. at 1100. The court responded that "acting in concert does apply to all of the counts," and stated further that mere presence at the scene, knowledge of the crime, or association with the perpetrators is not enough. Tr. at 1101-03. The court instructed that, to be found guilty of acting in concert to commit a crime, a defendant must have acted with the "state of mind required" and "solicited, requested, commanded, importuned, or intentionally aided another person or persons to engage in that crime." Tr. at 1103.

A second note, sent several hours later, indicated that the jury was at an impasse. The judge instructed them to continue their deliberations and then ordered them sequestered for the night. Tr. at 1107-09. The next day, the jury sent another note seeking clarification as to why

there were two weapons counts and as to "how 'in concert' applies to [the weapons counts]."  Tr. at 1112.  The judge instructed the jury that there were two counts of criminal possession of a weapon because the prosecution alleged that there were two weapons involved in the shootings, and that the concept of acting in concert applied to the two counts based on the principles explained the day before.  Tr. at 1114.

As noted above, the jury found the petitioner guilty of attempted murder in the second degree in connection with the shooting of Ethridge, and guilty as well of two counts of criminal possession of a weapon in the second degree.  Tr. at 1117-18.  Fair was found not guilty of second degree murder in connection with the shooting of Curtis Scott.

*Post-Trial Proceedings*

On November 26, 2002, petitioner's appellate counsel filed a brief with the Appellate Division, Second Department.  The sole argument raised in counsel's brief challenged the trial court's response to the jury's second note seeking clarification of the concept of acting in concert.  Br. for Def.-App. at 12; D.A. Letter, Doc. 2.[2]  Petitioner then filed a supplemental *pro se* brief, claiming that the evidence presented against him at trial was insufficient to support the verdict and that his counsel was ineffective because he failed to request a missing witness charge, failed to request a "proper jury charge" on the concept of acting in concert, and failed to object to the "repugnant verdict."  Supp. *Pro Se* App. Br.; D.A. Letter, Doc. 5.

On September 29, 2003, the Appellate Division affirmed Fair's conviction, holding that

---

[2]By letter dated January 4, 2006 ("D.A. Letter"), the Queens County District Attorney provided this court with a number of documents filed during the state court proceedings involving the petitioner.  Each document was numbered.  Petitioner's brief to the Appellate Division is document number 2.

his challenge to the trial court's response to the jury note was "unpreserved for appellate review" and that, "[i]n any event, the trial court's response to the note . . . was meaningful." *People v. Fair*, 308 A.D.2d 597 (N.Y. App. Div. 2003). The court further found that "trial counsel provided meaningful representation at all stages of the proceedings," "the evidence . . . was legally sufficient to establish the defendant's guilt beyond a reasonable doubt," and "the verdict of guilt was not against the weight of the evidence." *Id.* at 598. With respect to the "remaining contentions, including those raised in [defendant's] supplemental pro se brief," the appellate court found that they were "unpreserved for appellate review or without merit." *Id.*

Fair, seeking leave to appeal to the New York Court of Appeals, raised all of the grounds set forth in his counseled appellate brief and supplemental *pro se* brief. Letter Seeking Leave to Appeal to N.Y. Ct of App. at 1; D.A. Letter, Doc. 9. On December 1, 2003, petitioner's application for leave to appeal was denied. *People v. Fair*, 1 N.Y.3d 571 (2003).

On October 23, 2003, Fair filed a motion to vacate his judgment of conviction pursuant to Section 440.10 of the New York Criminal Procedure Law. Among the arguments pressed by Fair in his *pro se* brief were that his trial counsel was ineffective for failure to investigate the crime scene and for failure request a circumstantial evidence charge. D.A. Letter, Doc. 11. The court denied the 440.10 motion on January 8, 2004, because Fair, despite sufficient facts in the trial record, "unjustifiably failed to raise [his] claims" on direct appeal, and because "there is no merit to defendant's claims." Mem. & Or., Jan. 8, 2004, at 2; D.A. Letter, Doc. 14. On February 23, 2004, the Appellate Division denied Fair's application for leave to appeal from the lower court's denial of his motion. *People v. Fair*, Ind. No. 3485/98 (N.Y. App. Div. Feb. 23, 2004); D.A. Letter, Doc. 17.

On April 6, 2004, Fair filed another motion to vacate his conviction. D.A. Letter, Doc. 18. That motion was denied on August 4, 2004. The court found that, because he could have raised the claims presented by his motion on direct appeal, Fair was procedurally barred from asserting three of his claimed instances of ineffective assistance – failure to object to ballistics testimony, failure to investigate certain shell casings, and abandonment of Fair's self-defense claim – as well as a due process claim based on the failure to admit into evidence the weapon recovered from Curtis Scott's body at the scene of the shooting. Mem. & Or., Aug. 4, 2004, at 3; D.A. Letter, Doc. 20. The court did not address the merits of these claims in its decision. *Id.* Finally, the court denied Fair's claim based on trial counsel's failure to call the surviving victim, Jamel Ethridge, as a witness, because the claim was supported by a letter from Ethridge rather than a sworn affidavit, and because the letter did not explicitly contradict the fact, established at trial, that Fair was present at the scene of the crime or otherwise demonstrate that Ethridge's testimony would have been helpful to Fair. *Id.* at 3-4. On September 29, 2004, the Appellate Division denied leave to appeal this decision. *People v. Fair*, 2004-07457 (N.Y. App. Div. 2004); D.A. Letter, Doc. 23.

On October 6, 2004, Fair sought *coram nobis* review before the Appellate Division on grounds of ineffective assistance of appellate counsel. D.A. Letter, Doc. 24. The Appellate Division denied this application on the merits on January 24, 2005, ruling that "appellant has failed to establish that he was denied the effective assistance of appellate counsel." *People v. Fair*, 14 A.D.3d 621, 622 (N.Y. App. Div. 2005). The New York Court of Appeals denied petitioner leave to appeal this decision on April 28, 2005. *People v. Fair*, 4 N.Y.3d 853, 830 N.E.2d 326 (2005).

Fair then filed the pending petition for a writ of habeas corpus with this court on May 6, 2005. In letters dated November 12 and December 10, 2005, Fair claimed to have obtained "new evidence" regarding his case. Docket Entries 11-12. By letter dated January 9, 2006, Fair requested that his petition be held in abeyance while he pursued a motion to renew before the state court. Docket Entry 14. On April 13, 2006, I issued an order staying this case pending the outcome of the anticipated state court proceedings. Docket Entry 19.

In his motion to renew, petitioner presented two crime scene photographs obtained through a Freedom of Information Law ("FOIL") request and a magazine photograph of the building where the shootings at issue took place. Milaccio Aff. ¶ 11.[3] Petitioner claimed that these photos proved, in contrast to the sketch and thirty-two photographs of the crime scene presented at trial, that Jamel Scott could not have witnessed the shooting as he had previously testified. Def.'s Aff Supp. Mot. Renew ¶ 16. Petitioner further contended that the failure to present the photographs at trial supported his claim that it was ineffective for his trial counsel not to have investigated the crime scene. Def.'s Aff. Supp. Mot. ¶¶ 32-34. The state court denied Fair's motion, finding that Fair failed to present any reasonable justification for not offering the two crime scene photos he obtained through his FOIL request in support of his earlier post-trial motions. *People v. Fair*, No. 3485/98 (N.Y. Sup. Ct. Queens County, Apr. 12, 2006). The court further held that, even if Fair's claim about the photographs was considered on its merits, Fair would still not be entitled to relief because the photos failed to establish that Jamel Scott could not have seen the shooting and would not have changed the outcome of the trial even if they had

_____

[3]The documents pertaining to Fair's motion to renew before the state court were submitted by the District Attorney by letter dated July 26, 2006 ("D.A. Letter II"). Each of the documents referred to in this paragraph are attached to that letter.

been received in evidence. *Id.* at 3. On June 6, 2006, the Appellate Division denied Fair leave to appeal the trial court's determination. *People v. Fair*, No. 2006-04477 (N.Y. App. Div. June 6, 2006).

On June 19, 2006, Fair informed this court that his motion to renew had been denied and asked that his habeas petition be considered. *See* Docket Entry 22. Pursuant to a referral order from the Honorable Nicholas G. Garaufis, I issued an order lifting the stay and now proceed to consider the petitioner's claims. *See* Docket Entries 13, 21. For reasons set forth below, I respectfully recommend that the petition for a writ of habeas corpus be denied.

## Discussion

Liberally construed, Fair's petition asserts five grounds for relief. First, he asserts that the court failed to respond properly to the jury's second note, asking about the concept of "acting in concert." Second, he argues that he was denied his Sixth Amendment right to effective assistance of trial counsel, and asserts nine grounds in support of his ineffective assistance claim. Third, Fair asserts that the evidence at trial was insufficient to support his conviction. Fourth, Fair claims that the trial court failed to instruct the jury on circumstantial evidence. Fifth, and finally, he asserts that he was denied his Sixth Amendment right to the effective assistance of appellate counsel.[4]

A. ***Failure to Respond Meaningfully to the Jury's Second Note***

Petitioner's first claim is that the trial court failed to respond meaningfully to the jury's

---

[4]Fair's petition was timely filed pursuant to 28 U.S.C. § 2244(d). As demonstrated above, petitioner had a state court claim for post-conviction relief pending during all but a brief period from the time he was denied leave to appeal by the New York Court of Appeals to the time he filed the instant petition.

second note regarding the concept of "acting in concert," and in particular the application of that concept to the weapons charges. As discussed above, the Appellate Division rejected this claim on Fair's direct appeal as unpreserved for appellate review, citing New York Criminal Procedure Law § 470.05(2), and in any event lacking in merit. Indeed, Fair's trial counsel did not object to the court's response to the second note or express any dissatisfaction about it. Tr. at 1112. Accordingly, this claim was denied based upon an independent and adequate state law procedural ground. *See Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (holding that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim") (internal citations and quotations omitted).[5]

Petitioner's claim should also be rejected on its merits. Errors with respect to state jury instructions are generally not grounds for federal habeas relief. *See Gilmore v. Taylor*, 508 U.S. 333, 343-44, 113 S. Ct. 2112, 2118-19 (1993); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Rather, an erroneous jury charge may give rise to habeas relief only if the error deprives a defendant of a federal constitutional right:

> Before a federal court may overturn a conviction resulting from a state trial in which [an inadequate] instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

---

[5]Petitioner is unable to show cause and prejudice for his procedural default. Fair seems to argue that his procedural default was caused by his counsel's ineffectiveness. For reasons discussed in the text, however, I conclude that the trial court's response to the jury's note was not improper, and it therefore was not ineffective for trial counsel to fail to object to it.

*Cupp v. Naughten*, 414 U.S. 141, 146, 94 S. Ct. 396, 400 (1973). Even if an error in the charge implicates a constitutional right, habeas relief may be granted only if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id*. at 147, 94 S. Ct. at 400. In addressing this question, the challenged instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72, 112 S. Ct. at 482 (*quoting Cupp*, 414 U.S. at 147, 94 S. Ct. at 400-01). *See also Gaines v. Kelly*, 202 F.3d 598, 606 (2d Cir. 2000); *Copeland v. Walker*, 258 F. Supp. 2d 105, 138 (E.D.N.Y. 2003).

Petitioner has failed to identify any error in the court's acting-in-concert charge, much less one that deprived him of a federal constitutional right. Rather, the court's instruction to the jury – that, to be found guilty of acting in concert to commit a crime, a defendant must have acted with the "state of mind required" and "solicited, requested, commanded, importuned, or intentionally aided another person or persons to engage in that crime" – mirrors the language of the relevant statute. *Compare* Tr. at 1103 *with* N.Y. Penal Law § 20.00. Although petitioner's complaint seems to be with the court's specific response to the jury's second note asking about how the concept of acting in concert applies to the weapons charges, he fails to explain why he contends that the court's response was flawed, and I discern no error in the court's response. The jury simply asked whether the concept of acting in concert applied to the weapons charges, and the court explained that it did. Tr. at 1114. The court's response seems correct and clear, and in any event in no way discouraged the jurors from asking for further clarification if they remained confused. For all of these reasons, this aspect of the petition is without merit.

**B.**    *Ineffective Assistance of Trial Counsel*

Fair claims that his trial counsel was ineffective, and proffers nine separate grounds for his claim: (1) counsel failed to request a "missing witness" charge when the one living victim, Jamel Ethridge, was not called as a witness by the prosecution at trial; (2) counsel failed to request a proper jury charge with regard to "acting in concert;" (3) counsel failed to object to the verdict as internally inconsistent; (4) counsel failed to investigate the crime scene and rebut the government's assertions regarding it at trial; (5) counsel failed to request a circumstantial evidence charge; (6) counsel failed to call Jamel Ethridge at trial and question him about his affidavit stating that he was threatened by the police; (7) counsel failed to object to the testimony of Detective Gennari regarding the shell casings and weapon found at the crime scene; (8) counsel failed to investigate the disappearance of the weapon found under Curtis Scott's body as described by the ballistics expert; and (9) counsel abandoned Fair's claim of self-defense.

Respondent argues that all but one of petitioner's ineffective assistance of counsel claims are barred because, when petitioner raised them in his Section 440.10 motions, the state court rejected the claims on independent state procedural grounds. Respondent therefore asserts that all of petitioner's ineffective assistance claims, but for the one based on counsel's failure to call Jamel Ethridge to testify, are barred on independent and adequate state grounds.

Petitioner did raise claims of ineffective assistance of counsel on direct appeal. In his *pro se* brief to the Appellate Division, Fair asserted that his trial counsel was ineffective based on the first, second, third and sixth grounds set forth above. D.A. Letter, Doc. 5. These claims were rejected on their merits by the Appellate Division, and I therefore consider each of them subject to AEDPA's deferential standard of review. Petitioner did not, however, raise the remaining

grounds he now argues in support of his ineffective assistance claim on direct review (or, to the extent Fair relies on the crime scene photographs discussed above, when he first sought collateral review) and was, therefore, held to be procedurally barred when he attempted to raise each of them – except the claim concerning trial counsel's failure to call Jamel Ethridge as a witness – in state court collateral attacks. D.A. Letter, Docs. 14, 20. Accordingly, these remaining grounds were rejected on independent and adequate state grounds. Even if they had been properly preserved, however, I would recommend that they be rejected on their merits for the reasons discussed below.

      1.  Standard for Reviewing Ineffective Assistance Claims

In *Strickland v. Washington*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel must establish 1) that counsel was deficient, and 2) that the petitioner suffered prejudice as a result of the deficiency. 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). A petitioner must overcome a strong presumption that counsel's conduct was reasonable and constituted "sound trial strategy." *Id*. at 689, 104 S. Ct. at 2065. The petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment" but instead fell "outside the wide range of professionally competent assistance." *Id.* at 690, 104 S. Ct. at 2066. Moreover, even if counsel was deficient, under the second prong, relief is available only if the petitioner "show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694, 104 S. Ct. at 2068. "It is not enough . . . to show that the errors had some conceivable effect on the outcome" since virtually all of counsel's acts have some effect. *Id*. at 693, 104 S. Ct. at 2067.

2. Claims One, Two, Three and Six

Fair raised his first, second, third and sixth claims of ineffective assistance on direct appeal. The Appellate Division held that "trial counsel provided meaningful representation at all stages of the proceedings." 308 A.D.2d 597, 765 N.Y.S.2d 514 (2d Dep't 2003). Because it is clear that these prongs of Fair's ineffective assistance of trial counsel claim were adjudicated on the merits, AEDPA's deferential standard of review applies. *See Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (holding that a court has adjudicated a claim on the merits for purposes of § 2254(d) if "it (1) disposes of the claim on the merits and (2) reduces its disposition to judgment.") (internal quotations and citations omitted). Under AEDPA, a claim adjudicated on the merits in state court may give rise to habeas relief only if the underlying state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court," or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See also Mosby v. Senkowski*, 470 F.3d 515, 519 (2d Cir. 2006) (recognizing that the *Strickland* test is clearly established precedent for purposes of AEDPA).

A state court's decision may be "contrary to" "clearly established" Supreme Court precedent if it applies a legal rule that contradicts a conclusion reached by the Supreme Court on a question of law or if, when confronted with facts that are "materially indistinguishable" from those underlying a Supreme Court precedent, it arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 1519-20 (2000). A state court's decision is an "unreasonable application" of clearly established Supreme Court precedent if the court "identifies the correct governing legal principle" but its application of that principle to the facts is

"objectively unreasonable." *Id.* 409-13. This standard is "different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). For the reasons stated below, petitioner's claims of ineffective assistance of counsel fail to meet these exacting standards.

*Failure to Call Jamel Ethridge as a Witness or Seek a Missing Witness Charge*

Fair contends that Jamel Ethridge would have provided exculpatory testimony had he been called as a witness at trial. The only factual support Fair musters for his claim that Ethridge would have provided helpful testimony is a letter dated August 21, 1999, apparently signed by Ethridge, attached as an exhibit to his second Section 440.10 motion. *See* D.A. Letter, Doc. 18. The letter appears to be a recantation of a previously made incriminating statement, in which Ethridge now asserts that he did not recognize the three men who shot at Curtis Scott and him.

The events that unfolded at trial reveal circumstances more complex than petitioner's argument reveals. Apparently, Ethridge was expected to testify for the prosecution at trial. During the trial, however, the prosecutor advised the trial judge that Ethridge claimed to have been threatened and was as a result reluctant to testify as a prosecution witness. Tr. at 878. The court was prepared to hold a hearing outside the presence of the jury with respect to Ethridge's claim. At that point, however, Fair's trial counsel, in response to questions from the court, agreed that, if the prosecution did not call Ethridge in its case, Fair would not to seek a missing witness charge or otherwise comment on the prosecution's failure to call Ethridge to testify. Tr. at 881-82. The question thus becomes whether counsel's decision to forego a missing witness charge and not to call Ethridge as a defense witness was, under the circumstances, a reasonable trial strategy – or, more precisely, whether it was an unreasonable application of *Strickland* for the state court to so hold.

In light of the relevant circumstances, the decision to forego Ethridge's testimony and a missing witness charge was a reasonable tactical decision. Clearly, Ethridge had at least at one time made statements incriminating to Fair, and there was no guarantee that he would not repeat them at trial. Moreover, had the trial judge determined after a hearing that Ethridge had in fact been threatened, it might have affected the sentence Fair would receive if, as ultimately occurred, he were found guilty. In addition, Ethridge was the victim of the shooting, and might well have engendered jury sympathy regardless of the substance of his testimony. Perhaps most significantly, if the jurors sensed that Ethridge was afraid of Fair – a reasonably likely possibility in light of the prosecutor's allegations – it might well have had a seriously adverse impact upon their deliberations. Finally, in light of the highly incriminating testimony provided by Francis, Hogan and Jamel Scott, it seems unlikely that, even if Ethridge did provide exculpatory testimony, it would have changed the result at trial.

For all of these reasons, it was a reasonable exercise of professional judgment on the part of trial counsel to conclude that Jamel Ethridge's testimony might have been damaging to the petitioner, and to agree not to seek a missing witness charge or call Ethridge as a defense witness. *See Montalvo v. Annetts*, 2003 WL 22962504, at *25 (S.D.N.Y. Dec. 17, 2003) ("Courts in this Circuit have made clear that '[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial. . . .' Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed.") (*quoting United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)). This aspect of Fair's petition should be denied.

*Failure to Object to the Court's Response to the Jury's Second Note*

As discussed above, petitioner has failed to demonstrate that the court's response to the jury note asking about how the concept of acting in concert applied to the weapons charges was improper. "[W]hen a trial court's instruction is legally correct as given, the failure to request an additional instruction does not constitute deficient performance." *Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001). Accordingly, Fair's claim that it was ineffective for counsel not to object to the court's response should be rejected.

*Failure to Object to Verdict as Repugnant*

Finally, it was not objectively unreasonable for counsel not to move to set aside the verdict. Under New York law, a verdict is considered inconsistent or repugnant "where the defendant is convicted of an offense containing an essential element that the jury has found he did not commit." *People v. Trappier*, 87 N.Y.2d 55, 58 (1995) (citing N.Y. C.P.L. § 330.30(5)). Here, that simply did not occur.

A person is guilty of murder in the second degree when, "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." N.Y. Penal Law § 125.25. Petitioner was convicted of two counts of criminal possession of a weapon. Petitioner seems to argue that his conviction of possessing the weapon used to kill Curtis Scott and his acquittal of Scott's murder are inconsistent. Aff. in Sup. of Pet. at 7. Obviously, however, conviction of possession of a weapon does not require a finding of intent to cause another's death. Stated differently, possession of a weapon does not "contain[] an essential element" that the jury, by finding Fair not guilty of murdering Curtis Scott, found that Fair did not commit. Petitioner was also convicted of the attempted murder of Jamel Ethridge. The charges of which

Fair was acquitted involved intentionally causing Curtis Scott's death, and those charges did not involve any element of the attempted murder charge with respect to Ethridge. Thus, this aspect of the petition fails as well.

It bears noting that, although it is at first somewhat surprising that the jury decided to convict on the shooting of Ethridge and acquit with respect to the shooting of Scott, the verdict is not without its logic. As discussed above, a gun was recovered from Scott's body at the crime scene. The fact that Scott was armed may have given rise to reasonable doubt about whether Fair shot at Scott with the intention of killing him or whether he discharged his weapon defensively, having observed Scott's weapon. Moreover, Jamel Scott testified that he saw Leon Jones fire at Ethridge; no witness testified to seeing Fair actually shooting Scott. In any event, because none of the charges of which Fair was convicted include an element that his acquittal of murdering Scott demonstrates he did not commit, this aspect of his petition must be denied.

3. Remaining Claims of Ineffective Assistance of Trial Counsel

Petitioner's remaining claims of ineffective assistance were not raised on direct appeal (or, as to the crime scene photographs, on the first possible collateral attack), and were rejected on that basis when he sought post-conviction relief. These claims were, therefore, denied on independent and adequate state procedural grounds. *Alston v. Donnelly,* 461 F. Supp. 2d 112, 122 (W.D.N.Y. 2006) (finding that a procedural bar under Section 440.10 for failure to raise the claim on direct review constitutes an independent and adequate state law ground). As discussed above, however, the state court also reached the merits of petitioner's claims that trial counsel failed to investigate the crime scene or request a circumstantial evidence charge. In any event, as discussed below, each of petitioner's remaining ineffective assistance claims are meritless.

*Failure to Inspect the Crime Scene*

Although Fair argues that his trial counsel was ineffective for failing to investigate the crime scene, he presents no specific basis for concluding that a more thorough investigation would have led to the discovery of exculpatory evidence. Petitioner contends that an investigation of the crime scene would have revealed that Jamel Scott's testimony that he saw the shooting of Jamel Ethridge was not credible, but he offers no support for this bald conclusion. Moreover, Fair's argument makes little sense. Jamel Scott's testimony was that he observed Fair standing near the body of his brother Curtis when he came outside; he did not identify a precise location from which he claims to have made this observation. Thus, this is not a case, for example, in which a witness testified to seeing an event through a window that did not have a view of the scene the witness claimed to have observed. Moreover, thirty-two pictures and a detailed sketch of the crime scene were presented at trial. Tr. at 486-89. It is difficult to imagine what evidence a physical inspection of the crime scene might have developed that this evidence did not reveal. *Cf. Thomas v. Kuhlman*, 255 F. Supp. 2d 99, 103-04 (E.D.N.Y. 2003) (noting that, although it was "now undisputed" that it was physically impossible for the key witness to have observed what she claimed, "the testimony with respect to the layout of the buildings and the fire escapes was never refuted, no pictures of the buildings or fire escapes were introduced into evidence, and no diagram of the buildings was ever presented to the jury."). In any event, the absence of a more specific showing of how an inspection of the crime scene might have assisted counsel in developing exculpatory evidence is fatal to this aspect of Fair's ineffective assistance claim. *See Matura v. United States*, 875 F. Supp. 235, 237-38 (S.D.N.Y. 1995) (finding that a "bald assertion" that counsel should have conducted a more thorough pre-trial

investigation was insufficient to overcome the presumption that counsel was effective and that, to prevail, the petitioner should have stated "why his counsel's investigation was inadequate, what his counsel should have investigated, what this investigation would have produced, or how the fruits of this investigation would have aided petitioner's case.").

*Failure to Request a Circumstantial Evidence Charge*

As discussed in greater detail below, there was ample eyewitness testimony at trial, and it was therefore proper for the trial court not to provide a circumstantial evidence charge. For the same reason, it was not objectively unreasonable for counsel to have failed to request such a charge. *See Aparicio*, 269 F.3d at 99 (noting that trial counsel's failure to object to a jury instruction, or to request an additional instruction, is ineffective only when charge as given is clearly in error). This aspect of Fair's ineffective assistance claim should thus be rejected as well.

*Failure to Object to the Testimony of Detective Gennari*

Fair argues that "[t]rial counsel was ineffective when he did not object to the prejudice [sic] testimony by Detective Gennari about the shell casings and the weapon that was found." Pet. at 21. It is not clear, however, on what basis counsel might have objected to Detective Gennari's testimony; Fair's attack on Gennari's testimony appears to be a challenge to the witness' credibility rather than to the admissibility of his testimony. Moreover, a review of the record reveals that trial counsel did raise objections during Gennari's testimony, and that he conducted a thorough and thoughtful cross-examination as well. Tr. at 914-16, 918-41, 948-52. Accordingly, there is no basis to this aspect of the petition.

*Failure to Investigate the Disappearance of the Weapon Found under Curtis Scott's Body*

This aspect of Fair's petition proceeds from the assumption that the weapon recovered from the body of Curtis Scott could not be found at the time of trial. The trial record indicates, however, only that the prosecutor did not have the gun available in court; there is no indication in the record that the weapon was actually missing from police custody. Tr. at 936-37. In any event, it is not clear how offering the actual weapon as evidence at trial could have assisted the defense. There was ample ballistics evidence showing that none of the shells recovered from the scene were fired from Scott's gun. Moreover, the bullet recovered from Jamel Ethridge's chest was of a different caliber than the gun recovered from Scott's body; Scott's gun could not, therefore, have discharged the bullet that shot Ethridge. Even had Scott's gun been tested by defense experts who concluded, contrary to the test results obtained by the police, that Scott's gun had been fired at the crime scene, it would have had no bearing on the outcome of Fair's trial; although such test results might have suggested that Fair may have shot Scott in self-defense, Fair was *acquitted* of murdering Scott. Finally, as indicated above, trial counsel thoroughly cross-examined Detective Gennari with respect to his testimony about Scott's gun, and even introduced Gennari's ballistics report into evidence. *See* Tr. at 937-38. For all these reasons, this aspect of the petition should be rejected as well.

*Failure to argue self-defense*

Fair's final contention of ineffective assistance of trial counsel is that his attorney, having raised self-defense in his opening statement, abandoned the theory during the course of the trial. Once again, petitioner's argument is premised on an inaccurate recounting of the record. Trial counsel did not indicate in his opening that Fair would demonstrate that he acted in self-defense,

23

but instead made only two oblique references to the subject. First, counsel told the jury that they would hear that "Scott had a gun on him" and that was an "important factor in this case." Tr. at 408. Second, counsel "ask[ed]" the jurors not to limit their focus to one particular piece of evidence, but instead "to focus on everything, including aspects of what we have heard in common law or in our everyday world of self-defense." Tr. at 411. Thus, counsel may not properly be criticized for promising a case built on self-defense and then failing to deliver one.

To the extent Fair contends that his attorney should have pressed a claim of self-defense, that argument must be rejected as well. There was simply no evidence at trial – other than the gun found on Scott's body – to support a self-defense claim. To the contrary, Francis testified that Fair and the third man exited his taxi already armed, and Hogan testified that Fox instructed Fair and "Leon" to "kill everybody" before any shots were fired. Thus, pressing a claim of self-defense would not have been a credible strategy. Indeed, as discussed above, counsel's passing reference to self-defense was probably very helpful to Fair, who was, of course, acquitted of the charges involving Scott.

For all these reasons, counsel's decisions with respect to self-defense were reasonable and sound trial strategy within the wide range of professionally competent assistance. This aspect of Fair's petition should be rejected.

## C.    *Insufficiency of Evidence*

Fair next claims that the evidence at trial was insufficient to support his conviction.[6] The

---

[6]To the extent that Fair also asserts a claim that his conviction was against the weight of the evidence, his claim is not cognizable on federal habeas review. *See Santana v. Poole,* 2006 WL 3483923, at *9 (E.D.N.Y. Nov. 30, 2006) (*citing Douglas v. Portuondo*, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002)).

standard governing such claims was set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979). In *Jackson*, the Supreme Court held that, when reviewing a collateral challenge to a state conviction on the grounds that the verdict was not sufficiently supported by the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

Here, it is clear from the Appellate Division's decision on direct appeal that Fair's sufficiency claim was adjudicated on its merits before the state court. *See Norde,* 294 F.3d at 410. Accordingly, AEDPA provides that petitioner may prevail on this claim only if the appellate court's decision was "contrary to" or an "unreasonable application of" the Court's holding in *Jackson*, or if it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See Lutes v. Ricks*, 2005 WL 2180467, at *11 (N.D.N.Y. Sept. 9, 2005) (*citing Huber v. Schriver,* 140 F. Supp. 2d 265, 276 n.5 (E.D.N.Y. 2001)) (pointing out that *Jackson* is clearly established federal law governing claims of insufficient evidence). A habeas petitioner "bears a very heavy burden" in establishing that the state court's rejection of his legal insufficiency claim was contrary to, or an unreasonable application of, *Jackson*. *Einaugler v. Supreme Court of New York*, 109 F.3d 836, 840 (2d Cir. 1997) (*quoting Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)).

Viewed in the light most favorable to the prosecution, the evidence presented at trial in this case provided a more than sufficient basis for a rational juror to find Fair guilty of attempted murder in the second degree and weapons possession. Three witnesses – Lloyd Francis, Bashair

Hogan and Jamel Scott – placed the petitioner at the scene of the shooting in the company of Fox and a third man, and two witnesses – Francis and Scott – saw the petitioner holding a gun. Francis testified that he heard Fox instruct petitioner and a third man to "pop that nigger," and Hogan testified that he heard Fox tell petitioner and Leon to "kill everybody." Tr. at 684, 594. According to Jamel Scott, Fair was firing at him in response to an instruction from Fox at about the very same time that Leon Jones was shooting at Jamel Ethridge. Tr. at 769-73. Francis, Hogan and Jamel Scott all heard gunshots at or about the time they saw Fair at the scene of the crime. Only one gun was recovered from the crime scene, and Detective Gennari testified that it did not fire any of the bullets that struck Ethridge or Curtis Jones. The Appellate Division's conclusion that this evidence, when viewed in the light most favorable to the prosecution, was legally sufficient to support Fair's convictions, was surely not an "unreasonable application of" the Supreme Court's decision in *Jackson*.

Read properly, this portion of Fair's petition is merely an attack upon the credibility of the prosecution's witnesses, not the sufficiency of the evidence. For example, Fair asserts that "Hogan is not a credible witness," and argues that Francis "gave two different stories about what happened." Pet. at 11. However, the credibility and reliability of witnesses, and the weight to be afforded their testimony, are the exclusive province of juries, and a court "cannot second-guess a jury's credibility determination upon review of a habeas petition." *Ayala v. Ercole*, 2007 WL 1135560, at *8 (E.D.N.Y. Apr. 17, 2007) (citing cases).

For all these reasons, petitioner's claim that the evidence presented against him at trial was insufficient to support his conviction should be rejected.

**D.**     *Failure to Charge the Jury with Respect to Circumstantial Evidence*

Petitioner next contends that he was deprived of a fair trial because the trial court did not give a circumstantial evidence charge to the jury.  Petitioner failed to raise this claim on direct review.  He does appear to raise the argument in his first *pro se* Section 440.10 motion, D.A. Letter, Doc. 11, ¶ 32, but his claim was denied as procedurally barred.  D.A. Letter, Doc. 14, at 2.

In any event, Fair's claim fails on its merits.  As discussed above in Section A, errors in jury instructions are generally not cognizable on habeas review; relief is available only when the error deprives a petitioner of a federal constitutional right.

Here, plaintiff's contention that the trial court should have instructed the jury on circumstantial evidence is simply baseless.  To prevail on his claim, Fair must demonstrate (1) that the "instruction misstated state law" and (2) "that the error violated a right guaranteed to him by federal law." *Blazic v. Henderson,* 900 F.2d 534, 540 (2d Cir. 1990).  New York law, however, provides that a circumstantial evidence charge is necessary only where "proof of guilt rests exclusively on circumstantial evidence." *People v. Roldan*, 88 N.Y.2d 826, 827 (N.Y. 1996).  Where, as here, the prosecution presents eyewitness testimony which, if believed by the jury, would directly establish a defendant's participation in the crimes charged, a circumstantial evidence charge is not warranted.  *Id.*

As discussed in detail above, three eyewitnesses provided such testimony against Fair. One, Lloyd Francis, observed the defendant, holding a firearm, get out of Francis' taxi in response to a call to kill others *and* testified that he was threatened at gunpoint by the defendant. Another, Jamel Scott, observed the defendant fire gunshots at him *and* saw a second person, Leon Jones, shoot Jamel Ethridge.   Bashair Hogan also placed the petitioner at the scene of the

shooting in the company of Fox and a third man, and heard Fox tell Fair and Jones to kill

everyone, followed by gun shots.  Because of the ample direct evidence of the shooting of Jamel

Ethridge and the possession of weapons presented at trial, a circumstantial evidence charge was

not warranted.  This aspect of Fair's petition should be rejected.

**E.**      ***Ineffective Assistance of Appellate Counsel***

Petitioner's final claim is that he was denied the effective assistance of appellate counsel.

The effectiveness of appellate counsel is evaluated according to the standard set forth in

*Strickland v. Washington*, and requires that the petitioner show (1) that counsel's representation

fell below an objective standard of reasonableness and (2) that the result prejudiced the defense.

*Ulrich v. Berbary*, 445 F. Supp. 2d 267, 287 (W.D.N.Y. 2006) (*citing Claudio v. Scully*, 982 F.2d

798, 803 (2d Cir. 1992)).  *See also Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *Sellan v.

Kuhlman*, 261 F.3d 303, 315 (2d. Cir. 2001).  A petitioner does not have a constitutional right to

have appellate counsel raise every non-frivolous issue on appeal; accordingly, the Supreme Court

has cautioned judges not to "second-guess reasonable professional judgments" about which

issues to raise.  *Jones v. Barnes*, 463 U.S. 745, 754, 103 S. Ct. 3308, 3314 (1983).

As pointed out above, petitioner raised his claim of ineffective appellate counsel in a

post-trial motion, and the state court denied the claim on the merits.  Accordingly, AEDPA's

deferential standard applies.

Petitioner's claim is based upon appellate counsel's failure to raise several of the points

discussed above on direct appeal.  Having considered each of those claims on their merits, I

conclude that none were so compelling that it was unreasonable for counsel not to raise it.

Moreover, in response to petitioner's state court motion challenging her effectiveness, appellate

counsel submitted an affirmation setting forth her reasons for deciding not to raise the various issues Fair now contends were improperly omitted from his appeal.  D.A. Letter, Doc. 25.  The affirmation is clear and coherent, and provides an objectively reasonable basis for counsel's decisions.  Moreover, the appellate brief counsel did submit is written clearly and persuasively and appears to have been carefully prepared.  D.A. Letter, Doc. 2.  Certainly, the Appellate Division's conclusion that counsel's performance did not fall below an objective standard of reasonableness was not contrary to nor an unreasonable application of the Supreme Court's clearly established precedent in *Strickland*.  Accordingly, this final claim should be rejected as well.

### Conclusion

For the foregoing reasons, I find the petitioner's claims procedurally barred or without merit.  I therefore respectfully recommend that the petitioner's habeas petition be denied in all respects.  Any objections to this report and recommendation must be filed with the Clerk of the Court, with copies provided to the Honorable Nicholas G. Garaufis within ten days of receipt and in any event no later than January 31, 2008.  Failure to file timely objections may waive the right to appeal the District Court's order.  *See* 28 U.S.C. §636(b) (1); Fed. R. Civ. P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 14, 15 (2d Cir. 1989).

_____/s/_____
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
January 8, 2008

U:\smg current docs\FairvSmithHabeasR&R011107.wpd

29